# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RAYMOND JABLONSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 3398** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge** |
| **Commissioner of Social Security** | ) | **Nan R. Nolan** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Raymond Jablonski filed this action seeking review of the final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act ("Act"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented

to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and

have filed cross-motions for summary judgment. For the reasons stated below, this case is

remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant

must establish that he or she is disabled within the meaning of the Act.[1] *Keener v. Astrue*, 2008

WL 687132, at *1 (S.D. Ill. 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).

A person is disabled if he or she is unable to perform "any substantial gainful activity by reason

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1.  Is the claimant presently unemployed?

2.  Is the claimant's impairment severe?

3.  Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4.  Is the claimant unable to perform his former occupation?

5.  Is the claimant unable to perform any other work?

*See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on May 31, 2007, alleging he became disabled on November 16, 2004, due to rheumatoid arthritis in his knees and lower back. (R. at 110-13, 129-40.) The applications were denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 56-59, 78.)

On September 18, 2008, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 23-55.) The ALJ also heard testimony from Dr. Ashok

Jilhewar, a medical expert ("ME") and Pamela Tucker, a vocational expert ("VE"). (*Id.* at 45-55.)

The ALJ denied Plaintiff's request for benefits on January 13, 2009. (R. at 12-22.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since November 16, 2004, his alleged onset date. (*Id.* at 14.) At step two, the ALJ found that Plaintiff's severe impairments consist of "status post left knee abrasion chondroplasty,[2] mild degenerative disc disease, cardiomyopathy,[3] chest pain, morbid obesity, right rotator cuff tendonitis, and depression." (*Id.*) At step three, the ALJ determined that Plaintiff's impairments do not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff has the RFC to perform sedentary work. (R. at 16.) Specifically, the ALJ concluded that Plaintiff is limited to work that allows him

> the use of a cane to ambulate and does not require climbing ladders, ropes or scaffolds. [Plaintiff] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [Plaintiff] can frequently reach in all directions, including overhead with the right dominant upper extremity. Additionally [the ALJ] limited [Plaintiff] to unskilled work that is simple, routine and repetitive.

(*Id.*) Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff could not perform any past relevant work. (*Id.* at 20.) At step five, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that there are jobs that

---

[2] "Chondroplasty refers to surgery of the cartilage, the most common being corrective surgery of the cartilage of the knee." <http://en.wikipedia.org/wiki/Chondroplasty>

[3] "Cardiomyopathy … is the deterioration of the function of the myocardium (i.e., the actual heart muscle) for any reason. People with cardiomyopathy are often at risk of arrhythmia or sudden cardiac death or both." < http://en.wikipedia.org/wiki/Cardiomyopathy>

[4] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

exist in significant numbers in the national economy that Plaintiff can perform, including work as a sorter, bench worker and assembler. (*Id.* at 21-22.) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 22.) The Appeals Council denied Plaintiff's request for review on April 22, 2009 (*id.* at 1-4), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citation and brackets omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary

support or is so poorly articulated as to prevent meaningful review, the case must be remanded."

*Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

Plaintiff raises several arguments in support of his request for a reversal and remand: (1) the ALJ's analysis of Plaintiff's depression was not supported by substantial evidence; (2) the ALJ erred in giving greater weight to the opinion of the ME over the opinion of Plaintiff's treating physician; and (3) the ALJ erred in making the RFC determination without assessing the effect of Plaintiff's obesity on his other impairments. The Court addresses each in turn.

## A. The ALJ's Determination of Plaintiff's Mental RFC

Plaintiff contends that the ALJ's reasons for discounting the limiting effects of Plaintiff's depression were not legally sufficient. (Pl.'s Mot. 8.) Specifically, Plaintiff argues that despite supporting medical evidence, the ALJ rejected his treating physician's opinion regarding the limiting effects of Plaintiff's depression.

### 1. *Applicable Law*

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *see* 20 C.F.R. § 404.1527(d)(2) (The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Similarly, an "ALJ can reject an examining

physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Id.*

It is clear that an ALJ may not make an independent medical finding, substituting his own opinion of the medical evidence for that of the claimant's treating physician. *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) ("Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it."). If conflicting medical evidence is present, however, it is the ALJ's responsibility to resolve the conflict. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (ALJ must decide which doctor to believe). An ALJ should bear in mind that a treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Id.* at 979; *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507-08 (N.D. Ill. 1991). Nevertheless, an ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician in some cases, particularly where the nontreating physician has special expertise that pertains to the case and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien*, 439 F.3d at 377 ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). The testimony of a medical advisor may be given substantial

weight, even if the advisor did not personally examine the claimant. *DeFrancesco v. Bowen*, 867 F.2d 1040 (7th Cir. 1989).

### 2. *The Relevant Medical Evidence*

From September through December 2005, Plaintiff treated with David Kelner, M.D. (R. at 222-26.) Dr. Kelner observed that Plaintiff was very unstable, had anger issues, and exhibited narcissistic and antisocial traits. (*Id.* at 225-26.) Dr. Kelner diagnosed Plaintiff with depression and anxiety and prescribed Valium and Lexapro. (*Id.* at 224, 226.) On December 6, 2005, Dr. Kelner increased Plaintiff's dosages after finding him to be hopeless and distraught. (*Id.* at 224.)

Plaintiff treated with Zewdu Haile, M.D. every one to two months from June 2007 through August 2008. (R. at 309-22, 379-400, 476-526, 537-73.) Dr. Haile, who was Plaintiff's primary care physician, treated him for cardiomyopathy, chronic low back pain, and depression and anxiety secondary to his physical pain. (*Id.* at 402, 515, 521.) On June 7, 2007, Dr. Haile observed that Plaintiff was experiencing depressed mood, fatigue, loss of energy, feelings of worthlessness, crying spells, insomnia, diminished ability to concentrate, recurrent suicidal ideation, and social phobia. (*Id.* at 497.) Dr. Haile diagnosed chronic depression and prescribed 50mg of Zoloft. (*Id.* at 498.) On August 20, 2007, Plaintiff reported that his depression was improving. (*Id.* at 381.) On January 29, 2008, Dr. Haile noted that Plaintiff was "chronically ill-appearing" and doubled his Zoloft dosage to 100mg per day. (*Id.* at 483-84.) On July 28, 2008, Dr. Haile diagnosed depression and anxiety and found that despite various treatments, Plaintiff's depression was worsening secondary to his pain symptoms. (*Id.* at 521; *see id.* at 522 (noting that depression, anxiety and other psychological factors affect Plaintiff's physical condition).) Dr. Haile opined that Plaintiff was "[i]ncapable of even 'low stress' jobs." (*Id.* at 522.)

On February 4, 2008, John R. Brauer, Psy.D. conducted a psychological evaluation of Plaintiff on behalf of the Commissioner. (R. at 401-04.) Dr. Brauer observed that Plaintiff had an angry tone and was "chronically angry about his situation." (*Id.* at 402.) Plaintiff reported having daily suicide ideations. (*Id.*) Dr. Brauer found Plaintiff to be cooperative; appropriately groomed and attired; alert, calm and oriented to location, time, identity and circumstances; with clear, logical and sequential speech. (*Id.* at 403.) Plaintiff's affect was depressed, his concentration and attention were mildly impaired, his capacity for abstraction limited, and his judgment diminished when emotionally charged. (*Id.*) Dr. Brauer concluded that Plaintiff has difficulties with depression and anxiety and does not think well when angry. (*Id.* at 404.) Plaintiff's "history suggests that he has a long history of major depression, and that his current stressors have significantly added to this, as well as contributing anxiety symptoms." (*Id.*) Dr. Brauer diagnosed major depression, chronic and severe, and an adjustment disorder with mixed emotional features. (*Id.*)

On February 13, 2008, Kirk Boyenga, Ph.D., a nonexamining state-agency consultant, reviewed Plaintiff's medical records and concluded that Plaintiff had a moderate restriction of activities of daily living and mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 418.) Dr. Boyenga also completed a mental residual functional capacity assessment, concluding that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (*Id.* at 422-23.) Dr. Boyenga opined that Plaintiff is "capable of performing simple

tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. . . .

Adaption abilities are limited, but allow routine, repetitive tasks." (*Id.* at 424.)

> ### 3. Analysis

In her decision, the ALJ rejected Dr. Haile's opinion and adopted the opinion of Dr.

Boyenga, the nonexamining state-agency consultant. (R. at 19-20.) With respect to Dr. Haile, the

ALJ assigned his opinion "little weight" because "Dr. Haile's opinion that [Plaintiff] is disabled,

in part, due to depression is not supported by the record, including his own treatment notes." (*Id.*

at 20.) Specifically, the ALJ rejected Dr. Haile's opinion because: (1) Plaintiff "only had mental

health counseling in 2005 for three months;" (2) "Dr. Haile's own treatment records indicate that

[Plaintiff's] depression has improved;" and (3) Dr. Brauer, the consultative examiner, reported

that Plaintiff "was alert calm and oriented, with clear and logical speech, . . . when [Plaintiff] is

reasonably calm his judgment is grossly intact, . . . [and Plaintiff's] concentration and attention

were only mildly impaired." (*Id.*)

Under the circumstances, none of the reasons provided by the ALJ for rejecting Dr.

Haile's opinion are legally sufficient or supported by substantial evidence. First, the ALJ erred in

relying on the opinion of Dr. Boyenga, a nontreating, nonexamining consultant, over the opinion

of Plaintiff's treating physician. "[A] contradictory opinion of a non-examining physician does

not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion.

*See Gudgel*, 345 F.3d at 470; *accord Oakes v. Astrue*, 258 F. App'x 38, 44 (7th Cir. 2007)

(unpublished per curiam order); *Holmes v. Astrue*, 2008 WL 5111064, at *7 (W.D. Wis. 2008)

("[A] a contradictory opinion of a non-examining physician is not sufficient by itself to provide

the evidence necessary to reject a treating physician's opinion.").

Second, Dr. Haile consistently referenced Plaintiff's severe depression and anxiety in his treatment notes. (*See* R. at 310-11 (June 7, 2007—observing Plaintiff's anxiety and depressed appearance, diagnosing chronic depression and prescribing 50mg of Zoloft), 309 (June 19, 2007—following  up on Plaintiff's anxiety complaint and reducing Zoloft dosage to 25 mg),[5] 379 (July 16, 2007—noting "overall appearance is depressed"), 381-82 (August 20, 2007— reporting that Plaintiff has feeling of impending doom, manic episodes, social phobia and suicidal ideation; diagnosing chronic depression; and increasing Zoloft dosage to 100mg), 383-84 (August 30, 2007—diagnosing chronic depression and continuing Zoloft at 100mg), 483 (January 29, 2008—diagnosing chronic depression), 476 (July 15, 2008—observing that Plaintiff's "overall appearance is depressed").) The ALJ discounted Dr. Haile's opinion because "Dr. Haile's own treatment records indicate that [Plaintiff's] depression has improved." (*Id.* at 20.) However, while Dr. Haile indicated on one occasion—August 20, 2007—that Plaintiff's depression "problem is improving," on the same visit Dr. Haile observed that Plaintiff was experiencing depressed mood, fatigue, loss of energy, feelings of worthlessness, crying spells, insomnia, diminished ability to concentrate, recurrent suicidal ideation and social phobia, and increased Plaintiff's Zoloft dosage to 100mg. (*Id.* at 381-82.) On subsequent visits, Dr. Haile observed that Plaintiff's "overall appearance is depressed" and diagnosed chronic depression. (*Id.* at 383-84, 476, 483.)

The ALJ cannot discuss only those portions of the treating physician's reports that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.")

---

[5] At some point between June 19 and July 16, 2007, Dr. Haile increased the Zoloft dosage back to 50mg. (*Compare* R. at 309 *with id.* at 379.)

(internal quotation marks and citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). That Plaintiff's depression has fluctuated over time does not undermine Dr. Haile's opinion. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *Strocchia v. Astrue*, 2009 WL 2992549, at *17 (N.D. Ill. 2009) ("Dr. Dwivedi's notes show that Plaintiff's symptoms, mood and functioning varied between visits, and there were days when Dr. Dwivedi's observations of Plaintiff corresponded with the observations of the other medical sources. The differences in reported frequency, intensity, and limiting effects of these symptoms do not automatically indicate inconsistency, but instead should be expected in the course of ongoing treatment.") (citing *Bauer*, 532 F.3d at 609). Furthermore, even assuming that Plaintiff has "improved," the ALJ does not make an "accurate and logical bridge" between any improvement and Plaintiff's ability to work. *See Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp.*, 545 F.3d 555, 561 (7th Cir. 2008) ("Dr. Center's general conclusion that medication has provided 'significant benefit' to Tate does not prove anything unless the improvement is shown to be connected in some rational way to her ability to work."), *abrogated on other grounds*, *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149 (2010).

Third, the opinion of Dr. Brauer, the examining physician, does not contradict Dr. Haile's opinion. Dr. Brauer diagnosed Plaintiff with "adjustment disorder with mixed emotional features" and "major depression, chronic, severe." (R. at 404). An Adjustment Disorder "is

indicated either by *marked distress* that is in excess of what would be expected given the nature of the stressor or by *significant impairment* in social or occupational (academic) functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 679 (4th ed. 2000) (emphasis added); *see id.* at 680 ("The subjective distress or impairment in functioning associated with Adjustment Disorders is frequently manifested as decreased performance at work or school and temporary changes in social relationships."). Major Depressive Disorder is "accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 349; *see id.* at 369. A Major Depressive Disorder is "chronic" if the criteria for the disorder "have been met continuously for at least two years." *Id.* at 417. A "severe" Major Depressive Disorder is "characterized by the presence of most of the [depression] criteria symptoms and clear-cut, observable *disability* (e.g. *inability to work* or care for children)." *Id.* at 412 (emphasis added); *see id.* at 413 (Major Depressive Disorder is severe if the "symptoms *markedly interfere with occupational functioning or with usual social activities or relationships with others.*") (emphasis added). Thus, Dr. Haile's opinion that Plaintiff is "incapable of even 'low stress' jobs" (R. at 522) is entirely consistent with Dr. Brauer's diagnosis of Adjustment Disorder and Major Depressive Disorder, chronic, severe (*id.* at 404), which necessarily include clear-cut, observable disability, and marked limitations in social and occupational functioning.

Nevertheless, the ALJ contends that Dr. Brauer's findings contradict Dr. Haile's opinion that Plaintiff is disabled. (R. at 20). Specifically, the ALJ noted that "while the consultative examiner reported that [Plaintiff] was depressed, he was alert, calm and oriented, with clear and logical speech. He reported that when [Plaintiff] is reasonably calm his judgment is grossly intact. Additionally, he opined that [Plaintiff's] concentration and attention were only mildly

impaired." (*Id.*) However, the ALJ does not identify any medical opinion which indicates that these traits are at odds with Dr. Brauer's diagnosis of a Major Depressive Disorder and an Adjustment Disorder or Dr. Haile's opinion that Plaintiff is incapable of even low stress jobs. "The ALJ impermissibly 'played doctor' and reached his own independent medical conclusion[.]" *Myles*, 582 F.3d at 677; *see Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong."); *see also Clifford*, 227 F.3d at 870 ("In giving little or no weight to this finding, the ALJ did not cite to any medical report or opinion that contradicts Dr. Combs's opinion. In effect, the ALJ substituted his judgment for that of Dr. Combs and left unexplained why Clifford's activities were inconsistent with Dr. Combs's opinion. That was error.").

Furthermore, the ALJ ignored Dr. Brauer's findings that were consistent with Dr. Haile's opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (internal quotation marks and citations omitted); *Murphy*, 496 F.3d at 634 ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). For example, Dr. Brauer reported that Plaintiff "is chronically angry about his situation" and "considers suicide daily." (R. at 402.) Defendant discounts the symptoms that Plaintiff self-reported to Dr. Brauer, "such as past threatening behavior, past anger episodes, and past thoughts of suicide." (Def.'s Mot. 5.) However, psychologists and psychiatrists must necessarily rely heavily upon their patient's truthful reporting of their symptoms. Here, Dr. Brauer did not indicate that Plaintiff was malingering his symptoms. (*See* R. at 401-04.) On the contrary, Dr. Brauer found that Plaintiff's stated history was an accurate description of his current level of functioning. (*See id.* at 404

("Based on responses to the interview, as compared to presentation and stated history, this appears to be a valid representation of [Plaintiff's] current functioning.").) Furthermore, it does not appear that the Commissioner provided Dr. Brauer any of Plaintiff's medical records prior to the consultation.

Finally, Plaintiff testified that he could not afford psychiatric treatment. (R. at 39-40; *see also id.* at 402.) The ALJ rejected Dr. Haile's opinion that Plaintiff was disabled because Plaintiff had mental health counseling in 2005 for only three months. (R. at 20.) "In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). However, the ALJ cannot draw any negative inferences for the failure or infrequency of treatment unless the ALJ has explored the claimant's explanations as to the lack of medical care. *See id.* ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (citing SSR 96-7p). "An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'" *Id.* (quoting SSR 96-7p); *see* SSR 96-7p, 1996 WL 374186, at *8 (an explanation for not seeking medical care may include that the claimant is "unable to afford treatment" and does not have "access to free or low-cost medical services"). While the inability to afford psychiatric treatment is a reasonable explanation for the failure to seek treatment, the ALJ failed to discuss Plaintiff's explanation for not continuing mental health counseling in 2005. *See Myers v. Astrue*, 2009 WL 2746245, at *8 (N.D. Ill. 2009) (while claimant testified that he was unable to get free or low cost medical care, the ALJ failed to explain why he found the testimony untruthful).

**B.     The ALJ's Determination of Plaintiff's Physical RFC**

Plaintiff contends that the ALJ's reasons for rejecting Dr. Haile's opinion in favor of the nonexamining ME were not supported by substantial evidence. (Pl.'s Mot. 9-14.) Specifically, Plaintiff argues that "[t]he ALJ's rejection of Dr. Haile's opinion was based primarily on (1) an incomplete accounting of the medical evidence, and (2) a contrary opinion of a non-examining medical expert." (*Id.* at 14.)

*1.     The Relevant Medical Evidence*

On June 7, 2007, Plaintiff treated with Dr. Haile for pain on his right side and in his legs. (R. at 497.) Plaintiff reported persistent pain in his right side with a severity level of 8. (*Id.*) The pain was aggravated by bending, climbing or descending stairs, lifting, pushing, sitting, walking or standing. (*Id.*) Plaintiff also reported numbness, tingling in the arms and difficulty sleeping. (*Id.*) On examination, Dr. Haile found decreased thoracic and lumbar mobility, posterior tenderness and paravertebral muscle spasm. (*Id.*) Dr. Haile performed the straight leg raising test,[6] which was positive at 60° bilaterally. (*Id.*) Dr. Haile diagnosed Plaintiff with chronic back and postural pain and ordered various studies. (*Id.* at 498.)

On June 19, 2007, Plaintiff reported that his sharp, lower back pain was worsening. (R. at 495.) He stated that his symptoms were aggravated by bending, climbing stairs, walking or changing positions. (*Id.*) He also reported abdominal pain, decreased mobility, numbness, joint pain, spasms, tenderness, weakness and tingling in the legs and arms. (*Id.*) On examination, Dr.

---

[6] "The Straight leg raise . . . is a test done during the physical examination to determine whether a patient with low back pain has an underlying herniated disk . . . . With the patient lying down on his/her back on an examination table/or exam floor, the examiner lifts the patient's leg while the knee is straight. A variation is to lift the leg while the patient is sitting. However, this reduces the sensitivity of the test. . . . The straight leg raise test is positive if pain in the sciatic distribution is reproduced between 30 and 70 degrees passive flexion of the straight leg." <http://en.wikipedia.org/wiki/Straight_leg_raise> (citations and footnotes omitted).

Haile found decreased thoracic and lumbar mobility, posterior and right lumbosacral tenderness, and paravertebral muscle spasm. (*Id.*) Dr. Haile was unable to perform any tests due to Plaintiff's "severe pain." (*Id.*) Physical therapy notes from July 2007 indicated constant lower back pain, inability to walk or sit for prolonged periods, and inability to perform a lumbar spine evaluation or straight leg tests due to significant lower back pain. (*Id.* at 353-54.)

On August 20, 2007, Plaintiff reported sharp, stabbing pain in the lower back. (R. at 381.) While Plaintiff's pain was improving, his symptoms were aggravated by bending, climbing stairs, lifting or standing. (*Id.*) Dr. Haile performed the straight leg raising test, which was positive at 30° bilaterally. (*Id.* at 382.) He diagnosed chronic back/postural pain and ordered an MRI of the lumbosacral spine. (*Id.*) The MRI found early degeneration with slight diffuse bulging of the disk material at the L4-5 level; mild degenerative changes involving the facet joints with mild facet hypertrophy; small joint effusion with the right facet joint; and moderately severe bilateral foraminal stenoses,[7] greater on the left. (*Id.* at 441.)

On September 2, 2007, after seeing Plaintiff six times, Dr. Haile completed a lumbar spine residual functional capacity questionnaire. (R. at 317-21.) He diagnosed chronic back pain with mild diffuse disc bulge at L4-5 level, but declined to offer a prognosis until Plaintiff completed his second cycle of physical therapy. (*Id.* at 317.) Dr. Haile opined that Plaintiff's pain frequently interferes with attention and concentration needed to perform even simple work tasks. (*Id.* at 318.) Plaintiff can sit only 15 minutes and stand only 5 minutes before needing to get up or sit down. (*Id.* at 319.) He can sit or stand/walk less than 2 hours in an 8-hour work day. (*Id.*) Plaintiff cannot lift, carry, twist, stoop, crouch or climb ladders or stairs and has significant

---

[7] "Lumbar stenosis (spinal stenosis) is a condition whereby either the spinal canal (central stenosis) or vertebral foramen (foraminal stenosis) becomes narrowed. If the narrowing is substantial, it causes compression of the nerves, which causes the painful symptoms of lumbar spinal stenosis." <http://www.medicinenet.com>

limitations in doing repetitive reaching, handling or fingering. (*Id.* at 320.) Dr. Haile stated that Plaintiff is in constant pain, which is only partially or temporarily relieved with physical therapy and medicines. (*Id.*) Dr. Haile concluded that in his current state, Plaintiff is "seriously disabled to hold any job." (*Id.*)

On September 25, 2007, Plaintiff reported persistent, shooting lower back pain radiating from the right leg to the thigh. (R. at 489.) While Plaintiff's pain was improving, he stated that his symptoms were aggravated by climbing stairs, walking or changing positions. (*Id.*) Plaintiff also reported spasms, tenderness, abdominal pain, decreased mobility, numbness, joint pain, tingling in the legs and arms and shortness of breath. (*Id.*) On examination, Dr. Haile found posterior tenderness, paravertebral muscle spasm, and right thoracic and lumbosacral tenderness. (*Id.*) Dr. Haile performed a straight leg raising test, which was positive at 30° on the left side. (*Id.*) He diagnosed chronic back/postural pain and chronic dyspnea[8] and ordered a stress echocardiogram. (*Id.* at 490.)

On September 28, 2007, Plaintiff presented for his stress echocardiogram. (R. at 434-35.) Ejection fraction at rest was mildly depressed at 40 to 45%.[9] (*Id.* at 434.) During the stress test, Plaintiff developed accelerated idioventricular rhythm, as well as severe oppressive chest discomfort, and the test was immediately curtailed. (*Id.*) The test was indeterminate for ischemic heart disease. (*Id.* at 435.) However, because of the change in rhythm, oppressive chest discomfort and mild left ventricular systolic dysfunction at rest, a cardiac catheterization test was ordered. (*Id.*) On October 4, 2007, the cardiac catheterization test found normal coronaries and a

---

[8] Dyspnea is "unpleasant or uncomfortable breathing." *The Merck Manual* 357 (18th ed. 2006).

[9] Ejection fraction is "the fraction of blood pumped out of ventricles with each heart beat." <http://en.wikipedia.org/wiki/Ejection_fraction> "A normal ejection fraction is around 55 - 65%." <http://www.nlm.nih.gov/medlineplus> A decreased ejection fraction is one sign of cardiomyopathy. *Id.*

left ventricular ejection fraction of 55%. (R. at 427.) Plaintiff was diagnosed with non-obstructive coronary disease. (*Id.*)

Physical therapy notes from September 2007 indicated pain in the back and lower extremities, which increased with bending, reaching, prolonged sitting, standing and transfers. (R. at 350.) Plaintiff reported being unable to walk more than ½ block without pain. (*Id.*) Plaintiff's gait was antalgic, slow and guarded and he was in "acute pain." (*Id.* at 351.) Physical therapy notes from November 2007 indicated problems with activities of daily living, decreased activity tolerance, decreased strength and range of motion in the lower extremities, gait dysfunction, and pain that affected activity. (*Id.* at 345.) Plaintiff had decreased knee flexion and extension, and decreased weightbearing ability. (*Id.* at 347.)

On January 29, 2008, Plaintiff reported persistent, shooting and burning pain in the lower back, radiating to the left and right thigh. (R. at 483.) Plaintiff's symptoms were aggravated by bending, changing positions, ascending stairs and daily activities, and relieved by pain medications, drugs and physical therapy. (*Id.*) Dr. Haile found decreased thoracic and lumbar mobility, posterior and right lumbosacral tenderness, and paravertebral tenderness. (*Id.*) Dr. Haile diagnosed chronic back/postural pain and chronic hyperlipidemia. (*Id.*)

On March 27, 2008, Plaintiff reported that his lower back pain was worsening and radiating to his right thigh. (R. at 481.) He described the pain as piercing and burning and aggravated by walking. (*Id.*) On examination, Dr. Haile found posterior tenderness in the spine and paravertebral muscle spasm. (*Id.*) The straight leg raising test was positive on the right side at 45°. (*Id.*) Dr. Haile diagnosed chronic lumbago with acute exacerbation. (*Id.*) Physical therapy notes from May 2008 indicated decreased strength in the lower extremities, muscles tender and

hypertonic over the right scapular muscle and along the right thoracic, lumbar and sacral regions, with improved mobility but "still greatly limited due to pain." (*Id.* at 540.)

On July 15, 2008, Plaintiff reported persistent, sharp, shooting and burning pain in the lower back, radiating to the left and right thigh. (R. at 476.) The symptoms were aggravated by bending, standing, walking, changing positions, ascending or descending stairs, daily activities, extension and rolling over in bed. (*Id.*) Dr. Haile found decreased thoracic and lumbar mobility, posterior tenderness of the spine, and paravertebral muscle spasm. (*Id.*) He performed a straight leg raising test, which was positive at 30° bilaterally. (*Id.*) Dr. Haile diagnosed lumbago and noted that it was getting "worse." (*Id.* at 477.)

On July 24, 2008, Dr. Haile completed a physical residual functional capacity questionnaire. (R. at 521-25). He diagnosed chronic low back pain, depression and anxiety, which was worsening despite various treatments. (*Id.* at 521.) Dr. Haile also noted that Plaintiff has "exertional dyspnea, which makes him acutely breathless with any activity." (*Id.* at 524.) He described Plaintiff's symptoms as lower back pain radiating to the lower legs with frequent spasms, which three cycles of physical therapy failed to alleviate. (*Id.* at 521.) Dr. Haile opined that Plaintiff's pain was severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks, and that Plaintiff is incapable of performing even low stress jobs. (*Id.* at 522.) Plaintiff cannot walk without rest or severe pain. (*Id.*) He can sit only 30 minutes at a time before needing to get up, and stand less than 5 minutes before needing to sit down. (*Id.*) While Plaintiff can frequently turn his head, look up or hold his head in a static position, he can rarely look down and cannot twist, stoop, crouch, climb ladders or climb stairs and has significant limitations with reaching, handling or fingering. (*Id.* at 524.)

Dr. Haile also completed a cardiac residual functional capacity questionnaire on July 24, 2008. (R. at 515-20.) He reported that Plaintiff suffers from chest pain, anginal equivalent pain, shortness of breath, fatigue, weakness, palpitations, dizziness and sweatiness, and experiences nonradiating exertional chest pain on his left side, followed by acute palpitations. (*Id.* at 515-16.) Dr. Haile diagnosed cardiomyopathy and concluded that Plaintiff was incapable of performing even low stress jobs. (*Id.* at 515-16.) He opined that Plaintiff's cardiac symptoms are severe enough to constantly interfere with attention and concentration. (*Id.* at 517.) Dr. Haile's prognosis was "not good due to disabling pain," increasing weight and worsening cardiac condition. (*Id.*)

In August 2008, Plaintiff presented to the emergency room with chest pain. (R. at 574.)

The ME testified that Plaintiff's allegations of pain were "much more severe than expected on the MRI radiological examination." (*Id.* at 47.) Because Dr. Haile did not document Plaintiff's vital signs or symptoms and did not perform "straight leg tests lying down and sitting," the ME could not find support in the record for Plaintiff's pain allegations. (*Id.*) The ME cited other records, including the MRIs, which indicated only a mild back condition without neurological defects that does not require surgery. (*Id.* at 47, 49.) He opined that Plaintiff's lower back pain would restrict him to sedentary work. (*Id.* at 50.) With regard to Plaintiff's cardiac condition, the ME noted that during Plaintiff's cardiac catheterization test, his ejection fraction was normal. (*Id.* at 48.)

   2.   *Analysis*

In her decision, the ALJ rejected Dr. Haile's opinions and adopted the opinion of the ME. (R. at 18-19.) With respect to Dr. Haile, the ALJ assigned his opinions "little weight" for a number of reasons. (*Id.* at 18.) The ALJ rejected Dr. Haile's opinions that Plaintiff was disabled

as a result of chronic back pain and a cardiac condition, finding that they were not supported by the record, including [Dr. Haile's] own treatment notes." (*Id.*; *see id.* at 19.) Specifically, the ALJ rejected Dr. Haile's opinions because: (1) Plaintiff had been seeing Dr. Haile only three months and was still in physical therapy; (2) Dr. Haile's treatment notes indicate that Plaintiff's back pain was improving; (3) diagnostic testing suggest only mild degenerative disc disease with no disc herniation or spinal stenosis; and (4) Plaintiff's ejection fraction was normal. (*Id.* at 18-19.)

The ALJ found the ME's opinion "well supported by the record." (R. at 18.) Specifically, the ALJ noted that

> with respect to [Plaintiff's] left knee, the [ME] testified that [Plaintiff] reached maximum medical improvement in February, 2006 and did not complain of knee pain again until November, 2007. Additionally, he noted inconsistencies in 2007 when [Plaintiff] complained of knee pain and then reported the knee pain was getting better. With respect to the complaints of back pain, the [ME] testified that the two MRIs of the lumbar spine were consistent and both showed only mild degenerative disc disease while [Plaintiff's] allegations of pain were more severe that what was shown on the diagnostic tests. With respect to the cardiomyopathy, the [ME] testified that [Plaintiff] ultimately had cardiac catheterization in 2007 which showed non-obstructive coronary disease and normal ejection fraction after surgery.

(*Id.*)

Under the circumstances, none of the reasons provided by the ALJ for rejecting Dr. Haile's opinion are legally sufficient or supported by substantial evidence. First, the ALJ erred in relying on the opinion of the nonexamining ME over the opinion of Plaintiff's treating physician. "[A] contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *See Gudgel*, 345 F.3d at 470; *accord Oakes*, 258 F. App'x at 44; *Holmes*, 2008 WL 5111064, at *7 ("[A] a contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion.").

Second, Dr. Haile's treatment notes consistently reference Plaintiff's chronic back pain. (*See* R. at 497 (June 7, 2007—reporting persistent, severe lower back pain), 495 (June 19, 2007—reporting that sharp, severe lower back pain was worsening), 381 (August 20, 2007—reporting sharp, stabbing pain in lower back), 489 (September 25, 2007—reporting persistent, shooting pain in lower back, radiating from leg to thigh), 483 (January 29, 2008—reporting persistent, shooting, burning pain in the lower back which radiates to left and right thighs), 481 (March 27, 2008—reporting that piercing, burning pain in lower back which radiates to right thigh was worsening), 476 (July 15, 2008—reporting persistent, sharp, shooting, burning pain in lower back which radiates to left and right thighs).) The ALJ discounted Dr. Haile's opinion because "his treatment notes from August 20, 2007 indicate that [Plaintiff's] back pain was improving[; s]ubsequent treatment notes from September 25, 2007 indicate that [Plaintiff's] back pain was improving, and notes from January 29, 2008 indicate that relieving factors of [Plaintiff's] back pain included pain medications, drugs, and physical therapy[.]" (*Id.* at 18.) However, while Plaintiff reported on occasion that his pain was improving and responding to medications, drugs and therapy, Dr. Haile's treatment notes clearly describe a patient in persistent, acute pain. Thus, while Plaintiff reported on August 20, 2007 that the sharp, stabbing pain in his lower back was improving and relieved by exercise, pain medications, drugs and physical therapy, he also stated that the pain was aggravated by bending, climbing stairs, lifting and standing. (*Id.* at 381.) On examination, Dr. Haile found Plaintiff in uncomfortable distress, ill appearance, and decreased thoracic and lumbar mobility. (*Id.* at 382.)

Similarly, on September 25, 2007, Plaintiff reported that the persistent, shooting pain in his lower back, which radiates to his thigh, was improving. (*Id.* at 489.) Yet, he also stated that his pain was aggravated by climbing stairs, walking and changing positions. (*Id.*) Further, on

examination, Dr. Haile found posterior, right thoracic and right lumbosacral tenderness and paravertebral muscle spasm. (*Id.*) Likewise, while Plaintiff reported on January 29, 2008, that his pain improved with pain medications, drugs and physical therapy, he also described persistent, shooting, burning pain in his lower back when he bends forward and reported that the pain was aggravated by bending, changing positions, ascending stairs and daily activities. (*Id.* at 483.) On examination, Dr. Haile found Plaintiff in uncomfortable distress, chronically ill-appearing with decreased thoracic and lumbar mobility, posterior and right lumbosacral tenderness and paravertebral muscle spasm. (*Id.*)

The ALJ cannot discuss only those portions of the treating physician's reports that support her opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (internal quotation marks and citations omitted); *Murphy*, 496 F.3d at 634 ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Furthermore, even assuming that Plaintiff was "improving" and responding to drugs, medications and therapy, there is no medical evidence to support the ALJ's conclusion that Plaintiff was therefore capable of full-time work. *See Clifford*, 227 F.3d at 870 ("In giving little or no weight to this finding, the ALJ did not cite to any medical report or opinion that contradicts Dr. Combs's opinion. In effect, the ALJ substituted his judgment for that of Dr. Combs and left unexplained why Clifford's activities were inconsistent with Dr. Combs's opinion. That was error."). The ALJ cannot "substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Id.*

Third, other medical evidence supports Dr. Haile's findings. On August 24, 2007, an MRI was performed to assess Plaintiff's chronic low back pain and right leg pain. (R. at 441.) The MRI found

> early degeneration with slight diffuse bulging of the disk material at the L4-5 level. There are mild degenerative changes involving the facet joints with mild facet hypertrophy. There is a small joint effusion within the right facet joint. There are moderately severe bilateral foraminal stenoses, greater on the left. It is noted [Plaintiff's] articular symptoms are right-sided.

(*Id.*); *see Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.") (internal quotation marks and citations omitted). Furthermore, the physical therapy notes, which neither the ALJ nor the ME acknowledged, confirmed Plaintiff's chronic lower back pain. (*See* R. at 353-54 (July 30, 2007—inability to perform a lumbar spine evaluation or straight leg tests because of significant lower back pain), 351-52 (September 21, 2007—Plaintiff in acute pain), 348 (November 20, 2007—reporting severe pain which increases with standing, walking, stairs and transfers)); *see also Ynocencio v. Barnhart*, 300 F. Supp.2d 646, 654 (N.D. Ill. 2004) ("The ALJ is not required to discuss his reasons for rejecting every piece of evidence; he must, however, discuss the claimant's evidence that contradicts the Commissioner's position.").

Fourth, the ME's conclusion discounting Plaintiff's pain allegations because of the MRI results, which was adopted by the ALJ, is contrary to law. The ME found that the two MRI examinations—on August 24, 2007 (R. at 441), and August 22, 2008 (*id.* at 526)—indicated "mild degenerative disk disease at L5/S1 and with no other radiological findings." (*Id.* at 47.) The ME opined that "the symptom of [Plaintiff's] pain is [more] severe than expected on the MRI radiological examination." (*Id.*) The ALJ concluded that "the diagnostic testing of [Plaintiff's] lumbar spine and cervical spine suggests only mild degenerative disc disease with no disc herniation or spinal stenosis, inconsistent with a finding of disability[.]" (*Id.* at 18.)

However, the Seventh Circuit has made clear that "the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (per curiam); *see* S.S.R. 96-7p. Instead,

> [i]f the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citations omitted); *accord Clifford*, 227 F.3d at 871-72.

> Here, the ALJ stated that

> [a]fter careful consideration of the evidence, I find that [Plaintiff's] impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 16.) The ALJ's credibility analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"). Furthermore, to the extent that the ALJ rejected Dr. Haile's opinion because of a lack of verifiable medical evidence establishing the cause of Plaintiff's pain with certainty, the ALJ misapprehends the law. "As countless cases explain, the etiology of extreme pain often is unknown, and so one can't infer

from the inability of [Plaintiff's] doctors to determine what is causing [his] pain that []he is faking it." *Id.*

Defendant contends that the ME offered other reasons to support his testimony that Dr. Haile's opinion was not supported by his treatment notes or other medical evidence. (Def.'s Mot. 14.) Specifically, Defendant argues that the ME identified "improper" straight leg raise tests performed by Dr. Haile. (*Id.*) As an initial matter, the ALJ did not cite this as a reason for discounting Dr. Haile's opinion. Thus, Defendant "violated the *Chenery* doctrine (see *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S. Ct. 454, 87 L. Ed. 626 (1943)), which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922. In any event, the ME did not state that Dr. Haile's straight leg tests were "improper;" instead, the ME testified that "because the doctor did not do those straight leg tests lying down and sitting, . . . I cannot estimate if there is any reduction of the symptoms." (R. at 47.) Furthermore, a number of straight leg tests were performed, all of which were positive. (*See id.* at 497 (June 7, 2007—positive at 60° bilaterally), 382 (August 20, 2007—positive at 30° bilaterally), 489 (September 25, 2007—positive at 30° on the left side), 481 (March 27, 2008—positive at 45° on the right side), 476 (July 15, 2008—positive at 30° bilaterally).)

Defendant also contends that "Plaintiff presents a list of subjective abnormalities that he reported to Dr. Haile." (Def.'s Mot. 9.) Under some circumstances, the ALJ may place less significance on a treating physician's sole reliance on a claimant's subjective complaints. *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) ("[T]he doctor's opinion that Godbey's condition had not improved in ten years relies entirely on Godbey's allegations of the duration of her symptoms, and an ALJ may place less significance on a claimant's subjective complaints.").

However, Dr. Haile relied not only on Plaintiff's subjective statements, but also on his independent observations, testing and physical examinations, which found decreased thoracic and lumbar mobility, posterior and lumbosacral tenderness and paravertebral tenderness. (*See* R. at 476, 481, 483, 489, 495, 497.)

Fifth, the medical evidence supports Dr. Haile's assessment that Plaintiff was limited by his cardiomyopathy. The ALJ discounted Dr. Haile's opinion because "the [ME] testified that after [Plaintiff] had the cardiac catheterization procedure, his ejection fraction was normal." (R. at 19.) As an initial matter, the cardiac catheterization performed on October 5, 2007, was a diagnostic procedure, not a method of treatment (s*ee id.* at 426 ("The Diagnostic procedure is complete. Results were discussed with the patient/family."); MayoClinic.com, *Cardiac Catheterization* (May 28, 2010) <http://www.mayoclinic.com/health/cardiac-catheterization/ MY00218> ("Cardiac catheterization is a procedure used to check for many cardiovascular conditions, especially blockages in the arteries to your heart that could cause a heart attack."), and the ME did not testify otherwise (R. at 48). Other tests performed around the same time indicated an abnormal ejection fraction. (*Id.* at 512 (July 3, 2007—ejection fraction of 40-45%), 434 (September 28, 2007—ejection fraction of 40-45%).) And, during the diagnostic procedure, Plaintiff was able to achieve a maximum heart rate of only 75 beats per minute, which was only 41% of the maximum predicted rate for a person of his age. (*Id.* at 434.) Furthermore, less than a year later, Plaintiff was admitted to the hospital after complaining of chest pains. (*Id.* at 574.) In any event, the results of the cardiac catheterization procedure—diagnosing non-obstructive coronary disease (*id.* at 427)—was consistent with Dr. Haile's diagnosis of cardiomyopathy (*id.* at 515). *See* Steve R. Ommen, M.D. & Rick A. Nishimura, M.D., *Hypertrophic Cardiomyopathy—A Physician's Guide to the Treatment of Hypertrophic Cardiomyopathy*

(2000) <http://www.mayoclinic.org/hypertrophic-cardiomyopathy/ physiciansguide.html> ("Approximately half of [hypertrophic cardiomyopathy] patients do not have left ventricular outflow obstruction and yet can have limiting dyspnea on exertion.").

Finally, the ALJ failed to explicitly consider the effects of Plaintiff's obesity on his physical impairments. Plaintiff asserts that "[i]t would be reasonable to conclude from the evidence that [Plaintiff's] alleged limitations were supported by the combination of (1) his degenerative disk disease, functional knee problems, and cardiomyopathy, and (2) the effects of obesity on those impairments." (Pl.'s Mot. 17.) "An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). The ALJ did acknowledge, at step two, that Plaintiff's obesity was "severe" and, in adopting the ME's opinion, mentioned that Plaintiff had a Body Mass Index ("BMI") of 45.[10] Nevertheless, the ALJ did not consider the aggregate effect of Plaintiff's medical situation as a whole, including his obesity, as he is required to do. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *see* SSR 02-1p, 2000 WL 628049, at *6 ("An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time."); *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) ("[A]n ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment."). "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis

_____

[10] A BMI above 40 is classified as "extreme obesity" and "represent[s] the greatest risk for developing obesity-related impairments." SSR 02-1p, 2000 WL 628049, at *2.

alone." SSR 02-1p, 2000 WL 628049, at *6; *see Barrett*, 355 F.3d at 1068 ("Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both.").

Defendant contends that any error in failing to explicitly address Plaintiff's obesity was harmless. Defendant argues that "[t]he ALJ specifically predicated his decision upon consideration of the opinions of physicians who considered Plaintiff's weight." (Def.'s Mot. 3.) The Seventh Circuit has ruled that "a failure to explicitly consider the effects of obesity may be harmless error." *Prochaska*, 454 F.3d at 736. Specifically, where the claimant "does not specify how his obesity further impaired his ability to work" and "the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity," any error by the ALJ in failing to explicitly discuss the claimant's obesity is harmless. *Skarbek*, 390 F.3d at 504; *see id.* ("Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

Here, Dr. Niele, Plaintiff's treating physician, was well aware of Plaintiff's obesity when he opined that "Plaintiff is incapable of performing even low stress jobs." (R. at 522; *see id.* at 389, 476, 479, 481, 4893, 485, 487, 491, 493, 495.) Nevertheless, the ALJ adopted the ME's opinion, who found that Plaintiff had the RFC to perform sedentary work. (R. at 18, 50.) In forming his opinion, the ME noted that Plaintiff was "morbidly obese." (*Id.* at 48.) However, as noted above, none of the reasons provided by the ALJ for rejecting Dr. Haile's opinion—and adopting the ME's opinion—are legally sufficient or supported by substantial evidence. Thus, although the ALJ's failure to explicitly consider the effect of Plaintiff's obesity is subject to harmless error analysis, Defendant has not persuaded the Court that the error is harmless, given

the other flaws with the medical analysis. *See Villano*, 556 F.3d at 562 ("Though a failure to consider the effect of obesity is subject to harmless-error analysis, the Commissioner has not persuaded us that the error is harmless, given the other flaws with the RFC analysis and the analysis of Villano's ability to perform other jobs.") (citations omitted).

## C.    Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall re-evaluate Plaintiff's mental and physical impairments and RFC, considering all of the evidence of record, including the reports of Dr. Haile, and shall explain the basis of her findings in accordance with applicable regulations and rulings. The ALJ shall also consider the aggregate effects of Plaintiff's impairments, discussing the manner in which his obesity impacts his other diagnoses.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 17] is **GRANTED**, and Defendant's Cross-Motion for Summary Judgment [Doc. 22] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R :

_Nan R. Nolan_

_____

NAN R. NOLAN
United States Magistrate Judge

Dated: November 5, 2010